PYLE v. CLARK et al.

WRIGHT v. SAME.

(Circuit Court, D. Utah. July 13, 1896.)

1. RAILROAD COMPANIES—ACCIDENT AT CROSSING—PROVINCE OF COURT AND JURY.

It is now settled that it is not necessary to leave it to the jury whether a prudent man would look and listen before attempting to cross a railroad track, and it is the duty of the court to declare that a failure to look and listen is negligence.

2. SAME—FAILURE TO LOOK AND LISTEN.

Where one, approaching, in a wagon, a double-track railroad running north and south in a street, stopped, and looked to the north, and, seeing nothing, concentrated his attention for a minute and a half on a switch engine moving on the nearest track, and then, without looking again to the north, attempted to cross, and was struck by a train coming from that direction, held, that he was guilty of negligence, and a verdict for defendant was properly directed.

3. SAME—NEGLIGENCE OF DRIVER—EFFECT ON PASSENGER.

Negligence of the driver of a private conveyance, in failing to look and listen on approaching the track, is not imputable to one riding with him, in the absence of any relation of master and servant; nor is the passenger required to exercise the same watchfulness as the driver to discover an approaching train and give notice thereof.

These were two suits, brought, respectively, by George M. Pyle and A. E. Wright, against S. H. H. Clark and others, receivers of the Union Pacific Railway Company, to recover damages for personal injuries incurred by an accident at a railroad crossing. In the case of Pyle, the court directed a verdict for defendants, but refused to so direct in the case of Wright, and the jury found for plaintiff. Both cases were heard on motions for new trial.

Evans & Rogers, for plaintiffs.

Williams, Van Cott & Sutherland, for defendants.

MARSHALL, District Judge. By stipulation, these cases were tried together. On July 13, 1895, the plaintiffs were injured in a collision with a train operated by defendants as receivers of the Union Pacific Railway. The collision occurred at the intersection of Second North and Fourth West streets in Salt Lake City. There were two railway tracks in Fourth West street, extending from a point south of the place of accident to a point about two-fifths of a mile north of that place. The centers of these tracks were 14 feet apart. The eastern track was about 45 feet from the east street line. At a point two-fifths of a mile north of the place of accident, the west track curved to the west and departed from the street. At about the same point the east track was slightly deflected to the west until it was on a line with the southern portion of the west track, from which point it continued a straight track to a hill, a distance of about a mile. The west track was the main line of the railway. The east was a spur track to some limestone quarries. The plaintiffs lived in Buena Vista, Colo. They were going to Oregon, with the intention of settling there if they liked the country. They traveled in a

two-horse spring wagon. Both wagon and horses belonged to Pyle, who was a livery stable keeper. The plaintiff Wright, a physician, was, at the time of the accident, riding on the front seat with Pyle, who was driving and sitting on the north side of the wagon. The evidence does not show whether Dr. Wright was a gratuitous passenger, nor, indeed, any relation between Pyle and him, other than the fact that they were both going to Oregon in search of a place to locate, and that Wright was riding in Pyle's wagon. At about 4 o'clock in the afternoon of July 13, 1895, the plaintiffs drove west along Second North street. They saw the railway track, drove within about 50 feet of it, and stopped, their attention being attracted by a switch engine running on the spur track. This engine finally stopped a few feet south of Second North street. Pyle then drove within 12 to 14 feet of the spur track, where he again stopped. He then looked to the north, and testifies that he had a clear view along the street for a mile, and saw the spur track proceeding for that distance to the north, where it seemed to stop at a hill. From this he became satisfied that no train was coming from the north. He then watched the switch engine for about a minute, or a minute and a half, and, without again looking to the north, drove upon the track. When the wagon reached the west track, it was hit by a passenger train from the north, inflicting serious injuries on the plaintiffs. Several witnesses for both plaintiffs and defendants estimated the speed of this train at various points between the place of accident and the point two-fifths of a mile north of it, where the west track departed from the street. No witness placed this speed at more than 15 miles an hour. A city ordinance made it unlawful to run the train within the city at a speed exceeding 8 miles an hour. There was evidence tending to show that the statutory signals for street crossings were not given. The court directed a verdict in favor of the defendants in the case of George M. Pyle, but refused to so direct as to the plaintiff A. E. Wright. In the latter case the jury found for the plaintiff, and a motion for a new trial is made in each case.

In Pyle's case the evidence is undisputed that he had a clear view of the track in the direction of the approaching train for more than 2,000 feet; that the train was about a minute and a half in traversing this distance; that, if he had looked to the north within that period, he would have seen the train, and the collision would have been averted. But it is said that his attention was fixed on the switch engine. When he stopped within 12 or 14 feet of the track, he was in no danger from the switch engine. He testified that his horses were not frightened, but were so gentle that he "could drive them right into a train." It was not a case where the negligence of the defendants had placed him in a position of danger, rendering the exercise of cool judgment on his part impossible. He stopped for the purpose of viewing the situation, and then deliberately refrained from looking to the north for at least a minute prior to his attempt to cross the track. The reason he gives for his conduct is that he saw the straight track extending for a mile, and assumed that he was safe from that direction. But where he stood there were two tracks, and these, he could see, proceeded for two-fifths of a mile. From

there one track continued on its course.    He could not reasonably assume that the other stopped.    Immediately to the west of the main track was a line of telegraph poles, which followed that track on its curve from the street, and which, in itself, was an indication of the main line.    To this he paid no attention.    To the south of him, and in plain sight, several switch tracks joined the two principal tracks; and he had no right to assume that similar tracks did not join the main track to the north of him.    The railway track is itself a sign of danger, and travelers along the highway, before crossing the track, are required to look and listen for approaching trains.    If they fail to do so, and are thereby injured, their own conduct is condemned as negligent, and precludes a recovery.    It is not necessary to leave such a case to the jury, as the standard fixed by the law is one of specific acts rather than the generality that the conduct required must be that of an ideal average prudent man.    "If, in the whole department of unintentional wrongs, the courts arrived at no further utterance than the question of negligence, and left every case, without rudder or compass, to the jury, they would simply confess their inability to state a very large part of the law which they required the defendant to know, and would assert, by implication, that nothing could be learned by experience.    But neither courts nor legislatures have ever stopped at that point.    From the time of Alfred to the present day, statutes and decisions have busied themselves with defining the precautions to be taken in certain familiar cases; that is, with substituting for the vague test of the care exercised by a prudent man a precise one of specific acts or omissions.    The fundamental thought is still the same, that the way prescribed is that in which prudent men are in the habit of acting, or else is one laid down for cases where prudent men might otherwise be in doubt." Holmes, Com. Law, 111.    It is especially in crossing cases that this process of substitution is best shown.    If the circumstances are unambiguous, it is now well settled that it is not necessary to leave it to a jury to say if an average prudent man would look and listen for an approaching train before attempting to cross the track.    The common experience has become a part of the law, and it is the duty of the court to declare that the failure to look and listen is negligence. Railroad Co. v. Houston, 95 U. S. 697; Schofield v. Railroad Co., 114 U. S. 615, 5 Sup. Ct. 1125; Aerkfetz v. Humphreys, 145 U. S. 418, 12 Sup. Ct. 835; Elliott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85.    I do not think that the evidence discloses any reason for excepting the plaintiff Pyle from the operation of this rule.

With respect to Dr. Wright a different question is presented.    The attempt to cross the track at the time of the collision was Pyle's act, not his.    There is no evidence that he counseled it, or in any way concurred in it, save by silence.    Pyle was not his agent, and he had neither the right nor the power to substitute his judgment for Pyle's.    By what principle, then, is he liable for Pyle's act?    The doctrine of Thorogood v. Bryan, 8 C. B. 115, as to the identification of a passenger with his carrier, has been definitely overruled in England in Mills v. Armstrong, 13 App. Cas. 1, and condemned by the supreme court of the United States in Little v. Hackett, 116 U.

S. 366, 6 Sup. Ct. 391. The fact that, in the case at bar, Dr. Wright was riding in a private conveyance does not affect the question. The principle is that the driver was not his servant,—that having no right to control his action he was not liable for its results. In Railway Co. v. Eadie, 43 Ohio St. 91, 1 N. E. 519, a girl of 16, capable of taking reasonable care of herself, riding with her father, who was driving his own horse and wagon, was injured by a collision with a street car, caused by the concurring negligence of her father and the driver of the car. The court, after citing many cases which disapproved of Thorogood v. Bryan, said:

"The foregoing cases mostly relate to passengers by public carriers, and when the passenger is injured by the negligence of another public carrier or of a third person. It only remains to determine if a like rule applies where the plaintiff was a passenger in a private conveyance. We think it does. The plaintiff in the case at bar was in no just sense the master, nor was her father her agent, or under her control or direction. In Puterbaugh v. Reasor, 9 Ohio St. 484, the want of ordinary care of plaintiff's agent prevented his recovery, when the agent's negligence directly contributed to the injury, though the defendant was also guilty. But it is well settled that passengers in a public conveyance are not so liable for the negligence of the employés of the carrier, because they are not the agents of the passenger. The same reasons apply with equal force to a private carrier. Plaintiff's relation to her father being that of a passenger in his wagon, going to their common home, did not, in law, make him her servant or agent, and, as such, responsible for his misconduct."

To the same effect are Robinson v. Railroad Co., 66 N. Y. 11; Noyes v. Boscawen, 64 N. H. 361, 10 Atl. 690; Town of Albion v. Hetrick, 90 Ind. 545; Dyer v. Railway Co., 71 N. Y. 228; Nesbit v. Town of Garner, 75 Iowa, 314, 39 N. W. 516.

But it is said that the law imposed on Dr. Wright the same duty of watchfulness that was required of Pyle, the driver of the team,— that Dr. Wright should have seen the approaching train and have warned Pyle of the danger. I do not think the law fixes a standard of specific acts for passengers in either public or private conveyances. If such a passenger, as matter of law, must look and listen for approaching trains before the carrier crosses the track, it would be negligence for him to ride in such a position in the vehicle as to preclude his looking. As said by Mr. Justice Depue in Railroad Co. v. Steinbrenner, 47 N. J. Law, 161–171:

"Not only the hirer of the coach, but also all the passengers in it, would be under a constraint to mount the box and superintend the conduct of the driver in the management and control of his team."

It is matter of common experience that passengers in a vehicle trust to the driver to avoid the ordinary dangers of the road, and I do not know of any principle of law which requires them to tender advice, unless conscious of the driver's ignorance or want of care. If the law were otherwise, there would have been little reason for inventing the doctrine of identification, so far, at least, as the passengers of private carriers are concerned. In each case it would have been sufficient to say that the law required the passenger to look out for danger, and to advise the driver of the impending accident, that he failed in that duty, and could not recover. Such a doctrine would prevent his recovery even against the negligent

driver, or the driver's master. In that case, equally with the other, he would be met by the defense that he also had failed to look out for the danger, and was thereby guilty of contributory negligence.

The case of Peck v. Railroad Co., 50 Conn. 379, would seem to be the most favorable authority for the defendants on this proposition; but in that case the decision was finally rested on the identification of the passenger with the carrier,—a doctrine which it was useless to discuss if the duty to look was required of the former. In the case of Dean v. Railroad Co., 129 Pa. St. 514, 18 Atl. 718, a guest riding with the driver was held precluded from recovering for injury received in a collision at a railroad crossing. The driver approached the crossing at a trot,—did not stop or check his horses. The plaintiff was familiar with the crossing, but failed to warn the driver of the danger. Under the doctrine of the Pennsylvania courts, it was the duty of the driver to stop, look, and listen before crossing the railway line. The plaintiff knew that the driver, from ignorance or inadvertence, did not stop. After becoming conscious of the driver's negligence, it was but reasonable that he should at least have given some warning of the danger, or be held to have voluntarily incurred the risk of the driver's recklessness. There is nothing in this case militating against the views here expressed. It is not claimed that Dr. Wright knew of the approaching train, or knew that Pyle failed to look to the north before attempting to cross the railway line. He had a right to assume that Pyle would exercise ordinary care until something occurred to give him notice of Pyle's negligence. The motion in each case must be denied.